IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

RED CLIFF BAND OF LAKE SUPERIOR
CHIPPEWA INDIANS,

|  |  |
|---|---|
| Plaintiff, | OPINION AND ORDER |
| v. | 18-cv-828-wmc |
| BAYFIELD COUNTY, WISCONSIN, |  |
| Defendant. |  |

Plaintiff Red Cliff Band of Lake Superior Chippewa Indians seeks a declaratory judgment that enforcement of defendant Bayfield County's zoning code on fee simple land held by tribal members within the Red Cliff Band Reservation violates federal Indian law. Before the court is plaintiff's fully briefed motion for summary judgment (dkt. #10), on which the court heard oral argument on November 21, 2019.  For the reasons that follow, the court will grant plaintiff's motion for summary judgment, finding that it is not unmistakably clear that Congress intended to allow application of the County's zoning regulations on land held by tribal members within the boundary of the reservation.

UNDISPUTED FACTS[1]

**A. Red Cliff Band**

Plaintiff Red Cliff Band of Lake Superior Chippewa Indians ("Red Cliff Band" or the "Tribe") is a sovereign Indian tribe exercising governmental authority over its citizens and territory pursuant to its aboriginal sovereignty and a Constitution adopted under the

---

[1] The court finds the following facts material and undisputed unless otherwise noted.

Indian Reorganization Act of 1934 ("IRA"), 48 Stat. 984, as codified at 25 U.S.C. §§ 5101 *et seq*.  The Tribe is acknowledged by the United States "to have the immunities and privileges available to federally recognized Indian Tribes by virtue of their government-to-government relationship with the United States as well as the responsibilities, powers, limitations, and objections of such Tribes."  83 F3d. Reg. 34863, 34865, July 23, 2018.[2]

For most of its history, the Tribe was governed by traditional, clan-based structures. In 1936, the Tribe adopted a Constitution under the IRA.  The Tribe today is governed by an elected, nine-member Tribal Council, including a Chair, Vice-Chair, Secretary and Treasurer, serving staggered, two-year terms.  The Tribal Council exercises both executive and legislative powers, while the Tribal Court exercises judicial powers.

### B. Bayfield County

Defendant Bayfield County is located within the State of Wisconsin.  Wis. Stat. § 2.01(4).  The following map depicts the County's boundaries as demarcated by neighboring Ashland, Douglas and Sawyer Counties and Lake Superior, with the Red Cliff Reservation comprising the shaded area in the upper right hand corner of Bayfield County.

---

[2] The Tribe is a successor-in-interest to the La Pointe Band of Lake Superior Chippewa that signed the Treaty of September 30, 1854, with the United States at LaPointe, Wisconsin.  110 Stat. 1109. In particular, the Tribe is a successor-in-interest of the La Pointe Band led by Chief Ke-Che-Waishke.

2



"Map of Bayfield County, Wisconsin," Wisconsin Online, https://www.wisconline.com/counties/bayfield/map.html (last visited Jan. 3, 2020).

Title 13 of the Bayfield County ordinances sets forth the County's comprehensive zoning code. Title 13 - Chs. 1-3, Code of Ordinances, Bayfield Cty., Wis., https://www.bayfieldcounty.org/752/County-Ordinances (last visited Jan. 3, 2020).

### C. The Reservation

Established and guaranteed to the Tribe by the La Pointe Treaty, the Tribe's Reservation is located on the shores of Lake Superior as depicted, encompassing approximately 14,540 square acres or about 1% of Bayfield County's 2,042 square miles. The Reservation lands are currently held as follows, with approximate acreages assigned to each category:

- Trust lands owned by the Tribe                                      6,331 acres
- Fee lands owned by the Tribe                                        1,047 acres
- Trust or restricted fee lands owned by tribal members              1,767 acres
- Fee lands owned by tribal members                                    511 acres
- United States Apostle Islands Lakeshore (federal)                  1,540 acres
- Forest fee lands owned by Bayfield County                          1,500 acres
- Fee lands owned by non-Indians other than the County               1,845 acres

(Williams Aff. (dkt. #12) ¶ 12.) These categories of land held within the Reservation's boundaries are also depicted in the following 2014 Land Ownership Map.



(Williams Aff., Ex. A (dkt. #12-1).)

Relying on the Tribe's demographic information, plaintiff represents that 83% of the approximately 1,353 persons who reside on the Reservation are Indians. Defendant objects to this figure on foundation grounds; it also points out that this number does not differentiate between members of the Tribe and members of a different tribe who may be Indian. Regardless, during the period from 1877 to 1897, the Reservation land was allotted to then tribal members, who received "patents" on that land subject to restrictions that neither the patentee nor his or her heirs could "sell, lease or in any manner alienate said tract without the consent of the President of the United States." In the following decades,

however, the restrictions on alienation were removed from many of the Red Cliff patents, and some of the allotment lands passed out of tribal hands as fee simple land to non-tribal members.

In 1934, Congress enacted the IRA, which repudiated the policy of allotment without necessarily reversing it, which the court addresses in more detail in the opinion below.  Following this repudiation, the Tribe and its members have overtime been able to repurchase much of the fee simple land within the Reservation.

Finally, in 1970, Congress enacted Public Law 91-424, creating the Apostle Islands National Lakeshore, which includes not only the Apostle Islands off the shore of the Reservation, but also approximately 1,540 acres of shore mainland within the Reservation. Those lands are now under exclusive federal jurisdiction and are not subject to regulation by the Tribe or the County.

### D. The County's Zoning and Tribe's Land Use Ordinance

Since its inception in 1976, Bayfield County's Zoning Ordinance has generally been applied to fee simple land on the Reservation, whether owned by tribal or non-tribal members.  In particular, permits required under Bayfield County's Zoning Ordinance were issued to tribal and non-tribal members for fee simple lands located on the Reservation. The Tribe's Land Use Ordinance, Chapter 37, was originally enacted on March 11, 1993, and last amended in 2003.[3]  Section 37.2 described the purpose of the Tribe's Land Use

---

[3] In the exercise of its legislative authority, the Tribal Council has also enacted over fifty ordinances, including many that relate to land use, such as logging and burning (Ch. 11), pollution and environmental protection (Ch. 12), leasing (Ch. 18), historic preservation (Ch. 20), water and sewer (Ch. 34), specific land use (Ch. 37), and flood damage reduction (Ch. 55).  Chapter 4 of the Red

Ordinance as follows:

> This Chapter is for the purpose of controlling land use within the Red Cliff Reservation boundaries for the protection of the health, safety and welfare of the people who live within the Reservation.  Its aim is to encourage the most appropriate use of the land, the protection of the Reservation's economic and social stability, the promotion of orderly development on the Reservation, and the preservation of natural areas.

(Wade Aff. (dkt. #12) ¶ 21.)

Among other things, the Tribal Land Use Ordinance provides for a Project Application and Compliance ("PAC") Review Board and a Zoning Administrator.  The PAC Board is composed of the Tribe's Historical Preservation Officer, Land Specialist, Public Works Department Administrator, Natural Resources Administrator and Health Specialist.  The PAC Board has the authority to review applications, hold hearings, approve and disapprove petitions for special permits, and adopt regulations.  The Zoning Administrator investigates violations and issues Land Use permits approved by the PAC team, as well as makes recommendations to the PAC Board with respect to general permits and to the Tribal Council with respect to appeals from denials.

Section 37.5 of the Tribal Land Use Ordinance also divides the Reservation into ten zoning districts, including four residential districts and designated commercial, agricultural, forestry, municipal/institutional and recreational districts.  The Ordinance identifies permissible uses within each district. Under § 37.8.1, a property owner must

---

Cliff Tribal Code also establishes the Tribal Court and provides procedures for the enforcement of tribal ordinances in that court.  The Land Use Ordinance and other ordinances are available on the Tribe's website.  "Code of Laws," Red Cliff Band of Lake Superior Chippewa, http://redcliff-nsn.gov/Government/chapters_table_contents.htm (last visited Jan. 3, 2020).

apply to the PAC for a land use permit

> before commencing any construction of a new building or
> structure, or any alteration of an existing structure which will
> require more land area than does the existing structure, or any
> moving or destruction of any structure, or other change in the
> use of land which may potentially affect traffic patterns,
> population density, or otherwise impact on the adjoining
> physical or social environment, within the boundaries of the
> Reservation.

The Ordinance further provides a separate process for special permits for otherwise impermissible uses and describes the circumstances under which the PAC may grant such permits in § 37.9.  Section 37.12 of the Land Use Ordinance further provides that "[t]he Tribal Prosecutor and the Tribal Attorney shall have the authority to prosecute violations of this Chapter."

Finally, pursuant to its rule-making authority, the Tribe's PAC Board has adopted Red Cliff Land Use Project Application and Compliance Review Policy and Procedures ("Land Use Policies").  The Land Use Policies apply to any "land use project within the exterior boundaries of the reservation" and provide additional details on the permit process.  Appendix 1 to the Land Use Policies contains an extensive list of PAC reviewable projects.  The Land Use Policies also include a fee schedule and list of tribal codes and ordinances that the PAC reviews in connection with projects under its jurisdiction.

### E.  Recent Disputes Over Application of County's Zoning to Land within the Reservation

In 2016, Red Cliff tribal members Curtis and Linda Basina satisfied all of the requirements under tribal law and the PAC process, resulting in receipt of formal Tribal authorization to develop, build and operate a micro-distillery, to be known as "Copper

Crow Distillery," on fee simple land that they purchased and owned within the Reservation.  After the County threatened them with enforcement of violation of its Bayfield County's zoning regulations in developing, building and operating the Copper Crow Distillery, the Basinas were forced to comply.

Similarly, Red Cliff tribal member Linda Bristol received a permit from the Tribe to construct improvements on her property, which is also located on fee simple land in the Reservation.  In 2017, the County sued her in the Circuit Court for Bayfield County for constructing a driveway without a permit.  In its brief in opposition to Bristol's motion to dismiss, the County argued that "the Supreme Court has already ruled that fee simple properties, within reservation boundaries, even if owned by a Tribe, are subject to state jurisdiction."  (Wade Aff. (dkt. #12) ¶ 30.)  The County also pointed out that Bristol subsequently obtained a permit and was not prevented from improving her property.

In a letter dated May 4, 2016, Bayfield County Attorney Linda Coleman responded to a proposal from the Tribe that the parties enter into a jurisdiction agreement, stating:

> Bayfield County will continue to implement and enforce County zoning ordinances on fee simple parcels located within the reservation boundary.  We will do so regardless of the tribal membership of the owners of such parcels.

(Wade Aff., Ex B (dkt. #12-2).)

OPINION

This dispute only concerns the County's asserted jurisdiction over fee simple land within the boundaries of the Reservation owned by tribal members, currently representing 511 acres or roughly 3.5% of the Reservation.  In particular, the County neither claims a

right to apply nor has it attempted to apply its zoning requirements to land within the Reservation that is held in trust or in fee simple by the Tribe itself.  Moreover, there is no dispute that neither the County nor the Tribe attempts to regulate the federally-owned United States Apostle Islands Lakeshore.  Finally, the Tribe disavows any interest in regulating the zoning of (1) the forest lands within the Reservation owned by the County or (2) fee simple land owned by non-tribal members.

In support of its motion for summary judgment, the Tribe directs the court to foundational United States Supreme Court cases considering challenges to state action against tribal members on tribal land, which found in favor of the tribes or their members after concluding that state action violated federal Indian law.  In *Williams v. Lee*, 358 U.S. 217 (1959), the Supreme Court held that Arizona state courts were not free to exercise jurisdiction over a civil suit by a non-Indian against an Indian where the cause of action arose on a reservation.  In that case, the owner of a general store located on the Navajo Indian Reservation in Arizona brought an action in state court against tribal members who lived on the Reservation to collect for goods sold to them on credit.  Relying on cases dating back to Chief Justice Marshall's opinion in *Worcester v. State of Georgia*, 31 U.S. 515, 8 L. Ed. 483 (1832), the Court explained the basic framework for deciding these type of challenges:  "Essentially, absent governing Acts of Congress, the question has always been where the state action infringed on the right of reservation Indians to make their own laws and be ruled by them."  *Id.* at 220.  Finding "[n]o Federal Act [that] has given state courts jurisdiction over such controversies," the Court concluded that Arizona courts lacked jurisdiction over such actions.  *Id.* at 222.

In *McClanahan v. State Tax Commission of Arizona*, 411 U.S. 164 (1973), the Supreme Court reiterated this basic principal, holding that an Arizona state individual income tax was unlawful as applied to reservation Navajo Indians with respect to income derived wholly from reservation sources.  Citing back to *Worcester*, the Court again explained, "[t]he principles governing the resolution of this question are not new.  On the contrary, '(t)he policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history.'"  *Id.* at 168 (citation omitted).  Nonetheless, the Court recognized "the trend away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance on federal pre-emption," while noting that the doctrine is still "relevant" as a "backdrop against which the applicable treaties and federal statutes must be read."  *Id.* at 172.   Finding no act by Congress conferring authority on states to tax "Indians and Indian property on an Indian reservation," the Court found application of Arizona's income tax to Navajo Indians living and working on the reservation inconsistent with this doctrine.  *Id.* at 170-71.

Seven years later, in *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980), the Supreme Court restated this basic framework, holding that Arizona's motor carrier license fee and fuel taxes as applied to a logging company contracted to sell, load and transport timber on an Indian reservation were preempted by federal law.  The Court explained,

> Congress has broad power to regulate tribal affairs under the Indian Commerce Clause, Art. 1, § 8, cl. 3.  This congressional authority and the "semi-independent position" of Indian tribes have given rise to two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members.  First, the exercise of such authority may be

> preempted by federal law.  Second, it may unlawfully infringe
> "on the rights of reservation Indians to make their own laws
> and be ruled by them."

*Id.* at 142 (quoting *Williams*, 358 U.S. at 220) (internal citations omitted).  Finding no congressional consent and rejecting the state's bases for distinguishing prior cases, the Court similarly struck down Arizona's motor carrier license fee and fuel taxes as applied to a logging company contracting with the tribe under federal law to provide timber services on its reservation.

Regardless of whether the doctrine of tribal self-government carries any independent force under current Supreme Court jurisprudence or simply provides context, these cases reinforce a general principle, which remains in place today, that a state may not regulate activities on tribal reservations and of tribal members on reservations absent express congressional authority.  Of course, as the County rightly points out, this principle does not foreclose all state or county regulation, as the Supreme Court recognized more recently in *County of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation*, 502 U.S. 251 (1992), holding that a county *was* authorized to collect property taxes on land held by tribal members within a reservation.  In *County of Yakima*, the Supreme Court explained that the Indian General Allotment Act of 1887 (also known as the Dawes Act, 24 Stat. 388, as amended, 25 U.S.C. § 331 *et seq.*) permitted a county to impose ad valorem (or property) taxes on reservation land held in fee simple following allotment in the last 19th century.  In so holding, the Court reviewed other tax cases, explaining "our cases reveal a consistent practice of declining to find that Congress has authorized state taxation unless it has 'made its intention to do so unmistakably clear.'"  *Id.* at 258 (quoting *Montana v.*

*Blackfeet Tribe,* 471 U.S. 759, 765 (1985)).   Nevertheless, the Court found such unmistakable intent in certain sections of the Dawes Act, as well as language in the Burke Act, 34 Stat. 182, 25 U.S.C. § 349, which Congress passed to amend the Dawes Act.  *Id.* at 254 (quoting Section 6 which stated "each and every member of the respective bands or tribes of Indians to whom allotment have been made shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside"); *id.* at 263 n.3 (quoting Section 5 of the Dawes Act, which provides that "at the expiration of the trust, the United States will convey the allotted land in fee 'discharged of said trust and free of all charge or incumbrance whatsoever'"); *id.* at 255 (quoting Burke Act that when patent in fee simple issued "all restriction as to sale, incumbrance, or taxation of said land shall be removed").

Similarly, in *Cass County, Minnesota v. Leech Lake Band of Chippewa Indians*, 524 U.S. 103 (1998), the Court held that in making reservation land freely alienable under the Dawes Act, Congress manifested a clear intent to render the land subject to state and local taxation, and the repurchase of the land "by an Indian tribe does not cause the land to reassume tax-exempt status." *Id.* at 115.  In so holding, the Court declined to rely on express language in the Dawes Act or the Burke Act; instead, the Court found that its decisions in *County of Yakima*, and in an earlier case, *Goudy v. Meath*, 203 U.S. 146 (1906), stand "for the proposition that when Congress makes reservation lands freely alienable, it is 'unmistakably clear' that Congress intends that land to be taxable by state and local governments, unless a contrary intent is 'clearly manifested.'" *Id.* at 113.

During oral argument, this court questioned whether the record at summary

judgment established, as the Tribe indicated in a footnote in its reply brief, that land within the Red Cliff Reservation was not allotted pursuant to the 1887 General Allotment Act or Dawes Act.  In subsequent briefing, the Tribe directs the court to evidence in the record that the land was allotted pursuant to the 1854 treaty described above in the facts, which predates the General Allotment Act and, therefore, as a matter of logic, the Dawes Act did not govern the allotment of the land at issue here.  (Pl.'s Suppl. Br. (dkt. #26-1).)[4]  In its own supplemental brief, the County concedes the same, but contends that it is inconsequential.  (Def.'s Suppl. Br. (dkt. #27).) The court is inclined to agree with the County in light of the more sweeping language in *Cass County* suggesting that it is the Congress's act of alienating the land within an Indian reservation by allotment, and not specific language in the Dawes Act or the subsequent proviso of the Burke Act, that provides support for the authority of a state or county to tax within an Indian reservation. As such, the court need not, and will not, resolve whether the language in the Dawes Act or Burke Act is material to the present dispute.[5]

Beginning with the obvious, however, this case, unlike *County of Yakima* and *Cass County*, involves *zoning* of land as opposed to its taxation.  On this question, the court does not have the benefit of Supreme Court, or even Seventh Circuit, guidance.  The County directs this court to *City of Sherrill v. Oneida Indian Nation of New York*, 544 U.S. 197 (2005),

---

[4] The court will grant leave to both parties to file supplemental briefs on this issue (dkt. ##26, 27), and it has reviewed and considered the parties' respective proposed briefs (dkt. ##26-1, 28) in rendering this decision.

[5] In light of this decision, the court also will deny as moot the parties' recent joint conditional motion for stay of proceedings.  (Dkt. #29.)

in which the Supreme Court held that equitable considerations of laches, acquiescence and impossibility barred the tribe's claim that its open-market parcels unified the fee and aboriginal title in the parcels, such that the tribe could reassert sovereign dominion over the parcels and avoid payment of city property taxes.  The County also relies on the extension of the *City of Sherrill* holding in two Northern District of New York cases, in which (1) courts found that the tribes at issue were not entitled to immunity from state and local zoning or land use laws, and (2) vacated their respective injunctions invoking the same equitable considerations as the Court in *City of Sherrill*.  *See Seneca-Cayuga Tribe of Oklahoma v. Town of Aurelius, New York*, 233 F.R.D. 278 (N.D.N.Y. 2006); *Cayuga Indian Nation of New York v. Village of Union Springs*, 390 F. Supp. 2d 203 (N.D.N.Y. 2005).

Critically, in this court's view, the undisputed record established in all three of these cases that the tribes each effectively abandoned the reservations for significant periods of time -- two hundred years in the case of *City of Sherrill*.  *See* 544 U.S. at 216 ("For the past two centuries, New York and its county and municipal units have continuously governed the territory.  The Oneidas did not seek to regain possession of their aboriginal lands by court decree until the 1970s."); *Seneca-Cayuga Tribe of Oklahoma v. Town of Aurelius, N.Y.*, No. 5:03-CV-00690 (NPM), 2004 WL 1945359, at *2 (N.D.N.Y. Sept. 1, 2004) (concerning challenge to zoning of land that was repurchased by the tribe in 2002); *Cayuga Indian Nation*, 390 F. Supp. 2d at 205 (considering challenge to zoning of land that was repurchased by the tribe after 2001).  In contrast, the County utterly fails to develop a record demonstrating even marginally analogous facts at issue here.[6]  Indeed, in *stark*

---

[6] In *Brendale v. Confederated Tribes & Bands of the Yakima Indian Nation*, 492 U.S. 408 (1989), the

contrast to the Oneida, Seneca-Cayuga and Cayuga at issue in those cases in which 99% or more of all reservation lands in the State of New York had been alienated, the undisputed record here demonstrates that the Red Cliff Tribe and its members owned significant portions of the Reservation for the entire, relevant period of time.  Moreover, as the court emphasized during oral argument and counsel for the County offered no response, there will still be a "checkerboard" arrangement with respect to zoning by the United States, County *and* the Tribe regardless of the outcome of this case, something that was avoidable in the *City of Sherrill*.

The County also directs the court to an Eastern District of Wisconsin case, *Oneida Tribe of Indians of Wisconsin v. Village of Hobart, Wisconsin*, 542 F. Supp. 2d 908 (E.D. Wis. 2008) ("Oneida I"), in which Judge Griesbach held that land allocated by the United States to individual tribal members in fee simple, later transferred to third parties, and then "newly-acquired" by the Oneida Tribe was subject to the Village's condemnation authority under Wisconsin law for partial use as a public roadway, as well as to assess that land for the costs of improvements.  Like the facts in *City of Sherrill*, and the two Northern District

---

Supreme Court considered a zoning challenge, but that case concerned tribal regulation of land *held by non-tribal members* -- the reverse of the facts and law at issue here.  The Court held that an Indian tribe did not have authority to zone fee lands owned by non-Indians within the reservation's "open area," but the tribe did have the authority to zone property owned by non-Indians in those areas of its reservations that were closed to the general public.  In so holding, the Court applied the general principal in *Montana v. United States*, 450 U.S. 544, that absent express delegation from Congress, a tribe may not regulate lands of nonmembers, unless one of two exceptions existed.  *Id.* at 428.  The *Montana* analysis, however, does not apply to the case at hand because this case does not involve a challenge to tribal regulation of non-tribal members.  Moreover, the holding and reasoning in *Brendale* is of limited assistance -- other than perhaps to offer additional support for the general principal that a tribe has an interest in regulating land within its reservation and that interest was not offset by the alienability of land under the Dawes Act or more generally.

of New York cases cited above, "fee patents were issued for the vast majority of allotted land on the Oneida Reservation and most of that land, including all of the land at issue here, fell out of Indian ownership." *Oneida I*, 542 F. Supp. 2d at 912.  Beginning around the 1970s, at the same time the Village of Hobart was developing a land use plan to build an industrial park, the Oneida Tribe was purchasing land where its reservation was previously located, which was also part of the planned industrial park.

In ruling in favor of the Village's authority to condemn what had become the tribe's property, Judge Griesbach found the question before him had already been answered by the Supreme Court's decisions in *County of Yakima*, *Cass County*, and *City of Sherrill*.  542 F. Supp. 2d at 915-16.  Marching lucidly through the same statutory history of the Dawes Act and the Burke Act proviso as the Supreme Court did in *County of Yakima*, and also helpfully discussing the equitable considerations on which the Court relied in the *City of Sherrill*, the court also relied on Congress's express consent to condemnation of allotted lands without tribal consent in the 1901 Act, codified at 26 U.S.C. § 357.  *Id.* at 916-23.

Again, however, while *Oneida I* involved land use regulation, it did *not* involve comprehensive zoning.  The importance of this distinction is perhaps best illustrated in a more recent case also brought by the Oneida tribe before Judge Griesbach, in which he distinguished between the prior challenge to application of condemnation laws and a new challenge to a Village's special event ordinance.  *Oneida Nation v. Vill. of Hobart, Wis.*, No. 16-C-1217, 2017 WL 4773299 (E.D. Wis. Oct. 23, 2017) ("*Oneida II*").  As Judge Griesbach explained:

> Unlike *Oneida I*, this is not a case where the Village is seeking to exercise in rem jurisdiction over land that is held in fee by

17

> the Nation. *See Oneida I*, 542 F. Supp. 2d at 923[-]27. In this
> case, by contrast, the Village seeks to regulate the conduct of
> the Nation and its members within the boundaries of the
> Nation's Reservation. Unless the Village is able to show that
> the Nation's Reservation has been diminished by Congress,
> [*California v. Cabazon Band of Mission Indians*, 480 U.S. 202,
> 207 (1987)][7] and not *County of Yakima v. Confederated Tribes &
> Bands of the Yakima Indian Nation*, 502 U.S. 251 (1992), or *City
> of Sherrill v. Oneida Indian Nation of New York*, 544 U.S. 197
> (2005), provides the rules governing the determination of the
> case.

*Id.* at *2. So, too, while Judge Griesbach's thoughtful accounting for and analysis of the

Dawes Act, Burke Act and related Supreme Court precedent in *Oneida I* is helpful as

context, it is equally distinguishable from the Tribe's challenge to the County's application

of its zoning ordinance here.

The only court that has considered the specific challenge at issue here appears to be

the Ninth Circuit in *Gobin v. Snohimish County*, 304 F.3d 909 (9th Cir. 2002), *cert. denied*

538 U.S. 908 (Mar. 10, 2003). In *Gobin*, the tribe's reservation is located entirely within

the County and compromises 22,000 acres or approximately 1.6% of the County's land

area. Approximately 2,000 tribal members and 8,000 non-members inhabit the reservation

land. Half of that land is held in trust for the tribe or its members; the other half is owned

in fee simple by tribal members and nonmembers. As here, the tribe has a land use

ordinance. Pursuant to that ordinance, two tribal members submitted an application to

the tribe to rezone and subdivide a 25-acre parcel of land that they owned in fee simple.

---

[7] *Cabazon* concerned application of a county's bingo ordinance to tribal members on a reservation. Relying on the general principal that "state laws may be applied to tribal Indians on their reservations [only] if Congress has expressly so provided," the Court found the ordinance unlawful, finding no clear congressional authority for its application. 480 U.S. at 207.

18

The county challenged the tribe's granting of the application, stating that it had a right to apply its own zoning ordinance to the land in question.  On appeal, the Ninth Circuit sided with the tribe, holding that the rights of Indians to alienate their land freely did not provide the county with a concomitant right to exert zoning regulations over those lands.  304 F.3d at 916-18.

Citing to *McClanahan*, the court explained, "[i]n determining the extent of State jurisdiction over Indians, State laws are not applicable to tribal Indians on an Indian reservation except where Congress has expressly intended that State laws shall apply."  *Id.* at 914.  The court also distinguished the zoning regulations at issue in this case from the topic of taxation at issue in *County of Yakima* and *Cass County*:

> To date, however, neither the Supreme Court nor this Court has extended *County of Yakima* to find that Congress expressly authorized any other State regulation of the Indians when it made Indian fee lands freely alienable.  Indeed, the Court in *County of Yakima* took pains to explain the narrowness of its holding.

*Id.* at 915.  Of particular importance to the Ninth Circuit's analysis was the distinction drawn in *County of Yakima*, and reaffirmed in *Cass County*, between Congress's authorization of "State and valorean property taxes" on feely alienable fee lands and refusal to find similar authorization of a State's "excise tax" on proceeds obtained by Tribal members in selling those same lands.  304 F.3d at 915-16.  For the same reason, the Ninth Circuit concluded that "[u]nlike the inextricably linked concepts of (forced) alienation and taxation found in *County of Yakima*, alienation and plenary in rem land use regulation are entirely unrelated."  *Id.* at 916.

The court agrees with this holding.  Even assuming the language in the Dawes Act

and Burke Act are applicable to this case and authorize taxation of the land itself, there is *no* express authorization by Congress for the County to apply its zoning ordinance on fee simple land owned by the Tribe or its members within the boundaries of the Reservation. The question then is whether the alienability of reservation land (and, more specifically, Congress's authorization of the alienability of that land) somehow establishes Congress's authorization for a county to apply its comprehensive zoning ordinance to land held by tribal members in fee simple in a reservation. Here, for two core, interrelated reasons, the court holds that it is not reasonable to rely on alienability generally to find express authorization for zoning of land held by tribal members on a reservation by a county.

*First*, nothing in *County of Yakima* and *Cass County* undermines Supreme Court jurisprudence that courts must construe congressional authority narrowly. To the contrary, the Court in *County of Yakima* reinforced this: "The short of the matter is that the General Allotment Act explicitly authorizes only 'taxation of … land,' not 'taxation with respect to land,' 'taxation of transactions involving land,' or 'taxation based on the value of land.'" 502 U.S. at 269. As the Ninth Circuit noted, the *County of Yakima* Court refused to find congressional authority for the county to apply an excise tax to land held in fee simple by tribal members, even though the Court concluded that a property tax did not fun afoul of federal Indian law. Certainly, such fine line-drawing supports limiting the holdings of *County of Yakima* and *Cass County* to taxation and, indeed, to *property* taxation. Relatedly, the Supreme Court in *Montana* advises that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." 471 U.S. at 766; *see also County of Yakima*, 502 U.S. at 269 ("Because it is eminently reasonable to interpret

that language as not including a tax upon the sale of real estate, our cases require us to apply that interpretation for the benefit of the Tribe.").

*Second*, zoning does not solely concern the regulation of land itself, like property taxation or condemnation. Instead, as described in the facts above, the County's comprehensive zoning ordinance attempts to regulate both fixtures and improvements on a property, as well as its uses and activities on it. Specifically, the County here seeks to apply its zoning ordinance to regulate a tribal member's construction of a driveway on her property within the Reservation, as well as other tribal members' ability to develop, build and operate a micro-distillery on fee simple land that they purchased and own within the Reservation. Perhaps portions of the County's zoning ordinance could properly be construed as only regulating the fee simple land itself, but other parts and its application plainly seek to regulate activities or uses on the land as well.[8] *See County of Yakima*, 502 U.S. at 269 ("The excise tax remains a tax upon the Indian's *activity* of selling the land, and thus is void, whatever means may be devised for its collection." (emphasis added)). For these reasons, the court concludes that the County's application of its comprehensive zoning ordinance to fee simply land held by tribal members within the Reservation violates federal Indian law.

---

[8] Perhaps recognizing the further "checkerboard" that would be inherent in such fine distinctions, the County has never argued for anything but an "up or down" ruling on its ability to apply its comprehensive zoning ordinance to fee simple land owned by Tribal members on the Reservation. Before the court would even entertain such a challenge, the parties would, at minimum, be required to negotiate the contours of such a narrow regulation, a process that would seem unlikely on its face to be worth the effort. *See Brendale*, 492 U.S. at 431 (encouraging district court "to stay its hand until the zoning proceedings had been completed").

ORDER

IT IS ORDERED that:

1) Plaintiff Red Cliff Band of Lake Superior Chippewa Indians' motion for summary judgment (dkt. #10) is GRANTED.

2) Defendant Bayfield County's motion for leave to file sur-reply (dkt. #21) is GRANTED.

3) Plaintiff's motion for leave to file post-hearing brief (dkt. #26) is GRANTED.

4) Defendant's motion for leave to file response to plaintiff's request to file post-hearing brief (dkt. #27) is GRANTED.

5) The parties' joint conditional motion for stay of proceedings (dkt. #29) is DENIED as moot.

6) The clerk is directed to enter judgment in favor of plaintiff.

Entered this 9th day of January, 2020.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge